**MAROUS et al., Appellees,**

v.

**OHIO BELL TELEPHONE COMPANY, Appellant.**

[Cite as *Marous v. Ohio Bell Tel. Co.* (1992), 80 Ohio App.3d 306.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 60470.

Decided May 26, 1992.

*Donald E. Caravona & Assoc.* and *Donald E. Caravona; Jerry Gluck,* for appellees.

*Edward L. Bettendorf,* for appellant.

DYKE, Judge.

Appellees, Laddie Marous, Jr. and his wife, Donna, brought suit against appellant, Ohio Bell Telephone Co., after appellee, an AT & T employee, was injured while working on appellant's property. A jury verdict awarded Laddie and Donna Marous awards of $465,000 and $10,000, respectively, which were reduced to $348,750 and $7,500, respectively, because Laddie Marous was found to have been twenty-five percent contributorily negligent. After motion and hearing the trial court granted a R.C. 1343.03(C) motion for prejudgment interest. On appeal appellant assigns the following error for review:

"The trial court abused its discretion in granting plaintiff/appellees' motion for prejudgment interest on the underlying judgment entry."

R.C. 1343.03(C) states as follows:

"Interest on a judgment * * * for the payment of money rendered in a civil action based on tortious conduct * * * shall be computed from the date the cause of action accrued to the date on which the money is paid, if * * * the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

█ "The decision as to whether a party's settlement efforts indicate good faith is generally within the sound discretion of the trial court * * * [and]

[t]his court will not overturn a finding on this issue unless the court's actions indicate an abuse of discretion" *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 203, 495 N.E.2d 572, 574. An abuse of discretion connotes more than an error of law or judgment; it implies an unreasonable, arbitrary or unconscionable attitude. *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 552 N.E.2d 202.

"A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." *Kalain, supra,* at syllabus (holding award of prejudgment interest an abuse of discretion).

We note that the Ohio Supreme Court more recently addressed the issue of whether a failure to make a good faith effort to settle exists by stating as follows:

"Furthermore, a lack of good faith means more than poor judgment or negligence; rather, it imports a dishonest purpose, conscious wrongdoing or ill will in the nature of fraud. *Ware v. Richey* (1983), 14 Ohio App.3d 3, 9, 14 OBR 6, 12, 469 N.E.2d 899, 905." *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 42, 543 N.E.2d 464, 470.

"Dishonest purpose, conscious wrongdoing or ill will in the nature of fraud" is *Ware's* definition of bad faith which *Ware* equates to a lack of good faith effort to settle. However, *Kalain,* whose syllabus *Villella* quoted, had specifically rejected the argument that a failure to make a good faith effort necessarily requires a finding of bad faith. *Kalain,* 25 Ohio St.3d at 159, 25 OBR at 203, 495 N.E.2d at 574. "A party may have 'failed to make a good faith effort to settle' even when he has not acted in bad faith. * * * *Ware v. Richey* (1983), 14 Ohio App.3d 3 [14 OBR 6, 469 N.E.2d 899] disapproved." *Id.* In a footnote *Kalain* notes that bad faith has been defined as " ' "a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." ' " *Id.* at fn. 1, quoting *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 276, 6 OBR 337, 341, 452 N.E.2d 1315, 1320.

However, not only did *Villella* contradict *Kalain* and cite a case specifically disapproved of by *Kalain* but the comments about the definition of lack of good faith appear to be dicta. In *Villella* the court vacated the award of prejudgment interest after setting out the statute, stating *Kalain's* syllabus (test for determining when a party has not failed to make a good faith effort),

repeating *Kalain's* holding that a party with an objectively reasonable belief that he has no liability need not make a monetary settlement offer, effectively defining a lack of good faith as bad faith (and citing *Ware*), and then concluding after analysis that there is no need to award prejudgment interest on punitive damages, as had been done in *Villella*. Up to that point it appeared that there were two grounds for the decision to vacate but the court specifically stated:

"Consequently, because punitive damages over and above the amount adequate to compensate the plaintiff were awarded, prejudgment interest to compensate for delay in payment was unnecessary and the award of prejudgment interest must be vacated." *Villella*, at 42, 543 N.E.2d at 471.

Thus, the sole reason for holding that the award had to be vacated was the fact that it was on punitive damages. The statements concerning the definition of a lack of good faith were merely dicta and we are still bound by *Kalain*.

## I

"The trial court's prejudgment interest hearing was improperly conducted; Ohio Bell was improperly prohibited from presenting evidence as to plaintiff's lack of good faith."

Appellant attempted to show appellees' failure to cooperate in discovery by questioning appellees' counsel about appellees' failure to produce documents requested by appellant. Appellant cites the following exchange:

"Q. Isn't it also true that I asked your client to produce for me the business records of the hay and grain business and the farm operation?

"A. Yes, Mr. Bettendorf, and we produced them. * * *

"Q. Were you present at the deposition of Mrs. Marous?

"A. You know, I said before, I may not * * *. I came a little bit late to the deposition of Donna Marous.

"Q. Were you there at the time that Mrs. Marous testified that she had all of those records in a box at home?

"A. I think she said she had records in a box at home.

"THE COURT: Does that have to do with whether or not you made an offer to settle this matter?

"MR. BETTENDORF: One of the issues in this case, Your Honor, is whether or not the Plaintiff himself made a good faith effort to settle the matter. That's what the Plaintiff has got to show in this hearing, and not only did Ohio Bell not make a good faith effort—

"THE COURT: Are you saying they didn't make any effort to settle the case, a good faith effort?

"MR. BETTENDORF: I am saying that one of the tests that the Supreme Court has outlined concerning whether or not good faith was done is whether or not they produced documents—

"THE COURT: You stayed on an offer of zero dollars right up until after the trial commenced and you say it's an issue as to whether they made a good faith effort[?]

"MR. BETTENDORF: I think it is, yes.

"THE COURT: I think you are absolutely wrong on that, Mr. Bettendorf.

"MR. BETTENDORF: That was the purpose of my inquiry here, Your Honor.

"THE COURT: Well, you're absolutely wrong on that.

"MR. BETTENDORF: I think the Kalain case and the—

"THE COURT: *The Kalain case is really not relevant to this matter today.* The fact of the matter is, you made absolutely no offer when there was an incident. There was a fall. There was [an] injury. There was at least allegations of negligence and ultimately a Jury found that there was negligence.

"MR. BETTENDORF: The test is not a 20/20 hindsight, Your Honor, as you know. It's whether or not based upon the evidence available—

"THE COURT: Whether or not you made a reasonable good faith effort. Well, you have all of the evidence available to you right from the beginning of this through two lawsuits here.

"MR. BETTENDORF: I would submit, Your Honor, that we did not. That was the point of my inquiry concerning Mrs. Marous right now.

"THE COURT: Well, Mrs. Marous is such a minor matter of this whole thing. Hers is simple derivative. What you have to determine here is what the real action, real claim here is. You made nothing on the real claim.

"MR. BETTENDORF: The testimony of this Plaintiff was that he was unable to work. We know that he was able to work his farm and the person that had information—

"THE COURT: He was not able to work at his usual employment. He lost that job apparently as a result of this fall.

"MR. BETTENDORF: My only point is that the Plaintiff spouse was allegedly running the business, about which we had a right to know and we requested in good faith both informally and formally the documents that would show what this business was.

"THE COURT: That's such a minor aspect of this whole thing, but you're nitpicking this thing this afternoon, Counsellor, *and I'll be frank to tell you, it's not doing you any good.* Proceed if you have any further questions that are relevant here.

"MR. BETTENDORF: That's all I had, thank you." (Emphasis added.)

The trial judge misstated the law and did not understand that the issue in question concerned evidence of Mr. Marous' ability to work and alleged damages rather than the consortium claim of Mrs. Marous. However, the trial court's written opinion acknowledges *Kalain* as controlling and states the proper test. Appellant failed to file a motion to compel. The documents were not necessary because, as appellant concedes, Mr. Marous' tax returns provided the needed information. We find no error.

## II

"When compared with the court's ultimate award of prejudgment interest for plaintiff, the trial court's concluding remarks at the prejudgment interest hearing show that the trial court failed to apply the correct test for determining the prejudgment interest issue."

At the conclusion of the hearing on the motion for prejudgment interest the trial judge made lengthy remarks in which he said that an award of prejudgment interest would be unjust and that based on the evidence available to appellant before trial it was able to, in good faith, make a statement that it would not pay anything because appellees might easily have lost. Therefore, appellant contends, the trial court awarded prejudgment interest simply because appellant made no offer before trial.

As noted, although the trial judge made an incorrect statement of law and offered preliminary opinions, he later wrote an opinion which correctly states the applicable law (*Kalain*). A court speaks through its journal entries, *Atkinson v. Grumman Ohio Corp.* (1988), 37 Ohio St.3d 80, 83, 523 N.E.2d 851, 854, not extemporaneous remarks specifically contradicted by a later journal entry. We find no error.

## III

"The trial court's statements about Ohio Bell's attitude were improper (and unfounded); and, in light of the prejudgment interest award, the statements played an impermissible role in the trial court's ultimate decision."

The trial court did improperly remark that it had been his experience that utilities such as appellant run up litigation expenses to discourage plaintiffs and refuse to settle. However, in the same commentary the trial judge later

said that appellant's record with regard to settling was good and that appellant had a good faith belief that it was not liable. There is no evidence that the later ruling against appellant was motivated by the attitude toward utilities. We find no error.

## IV

"Plaintiff's dismissal of his first lawsuit itself should preclude his recovery of prejudgment interest."

██ Mr. Marous had filed an earlier complaint which he dismissed shortly before trial and refiled almost a year later. The prejudgment interest statute grants interest back to the date that the cause of action accrued. Appellant argues that there was nothing new in the second complaint and that the dismissal was simply because Mr. Marous and/or his counsel were not prepared for trial.

Mr. Marous had a right to dismiss his claim without prejudice, Civ.R. 41(A)(1), and refile within a year, R.C. 2305.19. There is no evidence of the reason for the dismissal (although the parties agree Mr. Marous had surgery after the dismissal) but no reason is required. The new case increased the amount in the prayer but also added Ms. Marous as a plaintiff. Her claim would have been lost. We cannot infer an intention to unnecessarily delay the proceedings.

## V

"Ohio Bell's $55,000 offer to settle the case was made in good faith based upon all the evidence."

Appellant argues that the trial court awarded prejudgment interest because there was no offer before trial. However, appellant refers to the commentary whereas, as noted, the journal entry set out the proper standard. We find no error.

## VI

"Ohio Bell's pretrial evidence was sufficient to warrant its belief in nonliability."

██ Appellant had to prove that it had a good faith, objectively reasonable belief that it had no liability before it could be held blameless for making no offer at all prior to trial. In its attempt to do so, at the hearing on the motion for prejudgment interest appellant presented the testimony of its trial counsel. However, a bare statement that counsel had been told, or believed, or knew is clearly insufficient even if he refers to documentation when that

documentation is not part of the record before this court. Appellant offered no exhibits at the hearing. This court is limited to the record below. Appellant attaches to its brief an affidavit and portions of a deposition (Mr. Wiskoff) not filed with the court or otherwise made a part of the trial record. The testimony and evidence at the arbitration hearing to which the case was referred are not part of the record. Appellant refers to other depositions but only those of Bolanz and Sadlik were filed with the court. We are limited to those depositions, the exhibits elicited during discovery and the testimony at trial in which witnesses acknowledged their testimony during deposition. Appellant had to demonstrate what it knew by evidence contained within the record below to which this court is limited.

"a.  Plaintiff admitted misuse of the ladder."

Appellant notes that in depositions Mr. Marous, Cuthbert, Marous' supervisor, Bolanz, that supervisor's supervisor, and Wiskoff, Mr. Marous' ladder expert, admitted that Mr. Marous' method of moving the ladder was a violation of his employer's safety manual and an improper and unsafe practice. The depositions of Mr. Marous, Cuthbert, and Wiskoff are not part of the record. We cannot consider the excerpts of the Wiskoff deposition that are attached to appellant's brief. Bolanz's deposition was filed with the trial court and reveals that he testified that he wouldn't lean back or jerk in one direction and that it is common sense not to push or pull in such a manner that a slip will move the body away from the ladder. Appellant also notes that at trial appellees' expert, Burko, agreed that in his report he stated that Mr. Marous told him that he leaned back and that a ladder is moved by a "worker" leaning forward or backward with a jerk. However, that evidence of appellee's misuse went solely to contributory negligence and did not prove that the appellant would be absolved of liability. There was also evidence that appellant's own regulations required inspections and that they were not performed. Although Mr. Marous was supposed to inspect also that did not excuse appellant. It was not reasonable to assume that appellees could not prevail, albeit with a reduced award due to contributory negligence.

"b.  AT & T was contractually responsible for plaintiff's working conditions."

Appellant's brief states:

"The installation contract which plaintiff was performing for Ohio Bell on AT & T's behalf specifically provided that AT & T was responsible for plaintiff's working conditions, including conditions, equipment, etc., in the Ohio Bell facilities. The contract also *required AT & T to perform a pre-performance inspection* of Ohio Bell's equipment to ensure its suitability (and safety) for the work to be performed." (Emphasis added.)

The contract is not in evidence. Earlier, appellant's statement of facts insisted that as "AT & T's man 'in charge,' plaintiff was performing an AT & T's contract with Ohio Bell. That contract provided, among other things, that AT & T was responsible for the working conditions of its own employees, *i.e.,* including within Ohio Bell's facilities." A review of the pages to which appellant cites reveals that the trial transcript cites refer to testimony that established that Mr. Marous was working on appellant's property performing a contract under which appellant hired AT & T to do certain work for which Mr. Marous was a supervisor. The hearing transcript cite refers to an exchange during examination of appellees' counsel in which appellant's counsel asked appellees' counsel if he remembered "the provision in that contract that says AT & T is responsible for the work conditions associated with the AT & T performance of its contract." However, appellees' counsel replied, "No, I do not." Appellant's counsel succeeded only in having appellees' counsel concede that he didn't deny it was there.

Appellant points to no evidence to show that under the contract AT & T was responsible for Mr. Marous' working conditions, including equipment in appellant's facilities, or that the contract required AT & T to perform a pre-performance inspection.

"c. Plaintiff's method of moving the ladder inordinately weakened the brake cable."

Appellant argued that Burko, Mr. Marous' expert, testified at trial and at deposition that Mr. Marous' method of moving the ladder caused the wire to "birdcage," *i.e.,* to weaken the fibers of the wire.

The deposition is not part of the record.

At trial Burko testified as follows:

"Somewhere this cable was weakened and the *pulling of the cable by Mr. Marous caused it to separate.* * * * *I can't say exactly what caused this particular cable to break,* but when you have braided * * * wire * * * if the * * * wire becomes loosened and sort of spreads apart, there is a phenomena called birdcaging * * *. That weakens the rope if it's kinked or twisted, * * * if the things that clamp the cable to the top of the brake and the bottom of whatever the handle was that you pull on, if they are not secure properly or attached properly, it weakens the rope in those locations * * *." (Emphasis added.)

Immediately prior to this testimony Burko testified that Mr. Marous "fell because this particular cable broke and it was weakened." Appellant is reading the statement "the pulling of the cable by Mr. Marous caused it to separate" to mean that Burko felt Mr. Marous' method caused the cable to

"birdcage" or weaken. A review of the transcript belies that contention. Burko first said the fall was because the weakened cable broke and then explained that the cable broke because it was weakened and the pulling caused it to separate (*i.e.*, break). When asked what caused the weakening he did not say that Mr. Marous' pulling caused the weakening. He said he could not say exactly but something caused birdcaging. He had earlier stated that what Mr. Marous did was "acceptable" and "[i]t was not improper and it was not an unsafe way to do it."

Appellant also contends that Mr. McKeon, appellant's expert, testified at the arbitration that Mr. Marous' method of moving the ladder and the effect of doing so repeatedly "could" have combined to break the wire whether appellant annually inspected or not. That expert's speculation is not part of the record.

"d. Plaintiff's alleged 'photographs' of Ohio Bell ladders showing 'other' frayed cables were simply untrue.

Appellant insists that it knew that Mr. Marous was lying about having taken photographs of several frayed cables at the appellant's facility because appellant's employees had changed three of the six such cables "before the day the photographs were allegedly taken and brought the *remaining* three cables into court * * *." Mr. Marous said that the night of his accident he looked at the other cable at the Beachwood office and most of the five or six such cables at that office were also frayed. A few days or a week later he took some photographs of those other frayed cables.

Appellant argues that the frayed cables in the photographs were not from Beachwood since three of the six cables had been replaced by Mr. Morielli on the day of the accident. The affidavit by Morielli, which is attached to appellant's brief, speaks of the replacements but that affidavit is not part of the record before this court. The only evidence of appellant's pretrial knowledge are exhibits, the filed depositions of Sadlik and Bolanz and the trial admissions made during impeachment by deposition. Ironically, at trial an effort to refer to an affidavit by Morielli was successfully objected to by appellant.

Appellant also argues that appellant's employee, Carrabine, swore in an affidavit that the kind of cable in Mr. Marous' photograph had never been in the Beachwood office. As noted, attached to appellant's brief is an affidavit to that effect by *Morielli*, not Carrabine. There is no evidence in the record of an affidavit by Carrabine. The affidavit by Morielli says that it was prepared for the arbitration but there is no evidence that it became part of the record below.

"e. During the period of his alleged 'disability' plaintiff climbed ladders and worked both his farm and his hay and grain business."

Appellant argued that although Mr. Marous claimed that within a few months of his accident he was unable to climb any ladders, his supervisor, Bolanz, said that Mr. Marous climbed ladders at AT & T even while on restriction. In Bolanz' deposition he states that after the accident Mr. Marous worked from April 10, 1986 to some time in 1987 and was climbing ladders but shortly after he went back to work he started getting numbness in his legs and when the restriction was placed he stopped. Later, however, he said that on Mr. Marous' return in 1986 Mr. Marous was "working on a transition for a step by step and I would have to *assume* in order to perform that he would have to leave the desk and climb the ladder to take a look at the terminal." (Emphasis added.) That evidence is less than convincing.

Appellant also contends that Mr. and Mrs. Marous testified at deposition that Mr. Marous was fully fit to operate his farm and hay and grain brokerage business. The depositions of Mr. and Mrs. Marous are not part of the record.

Last, appellant argues that in contrast to appellant's expert and some of Mr. Marous' own doctors only Dr. Gableman said Mr. Marous could not work, but Gableman saw Mr. Marous fifty-one times, referred Marous to Gableman's own physical therapy clinic, was unfamiliar with the type of rolling ladder in question and was ignorant of Mr. Marous' outside jobs.

First, Gableman did not conclude that Mr. Marous could not work and Mr. Marous never claimed that he could not work. The complaint alleged only that Mr. Marous' "ability to work has been permanently impaired." Gableman testified that Mr. Marous had numbness in his foot and could not climb ladders. AT & T will not permit him to return to his old job, or any job, if he cannot climb ladders. Second, the fact that Gableman's credibility could be attacked did not discount his opinion entirely. His lack of knowledge of the fact that Mr. Marous continued to work at his outside jobs (other than climbing ladders) does not negate his opinion. He simply concluded that the fall caused the numbness. Appellant could not assume that he would not be believed.

## VII

"The jury's finding of 25% contributory negligence alone confirms Ohio Bell's good faith belief in its nonliability."

Appellant contends that if the ultimate jury verdict is relevant the fact that this jury found Mr. Marous twenty-five percent contributorily negligent

supports appellant's belief in its complete lack of liability. That conclusion does not follow from the premise. The verdict supports the appellant's position that Mr. Marous was partly to blame but would never justify a contention that he was entirely to blame or more than fifty percent contributorily negligent. The evidence aside, had appellant known that the jury would find appellant twenty-five percent contributorily negligent that fact would still not have justified making no offer at all prior to trial. In any event, the ultimate verdict is irrelevant. The question is the effort to settle, not whether the verdict was the one anticipated.

In the journal entry granting prejudgment interest the trial judge did note that there had been no offer before trial. However, the trial judge made this observation during the course of his opinion in which he concluded that appellant did not objectively believe it had no liability and had failed to evaluate on a rational basis. The trial judge pointed out that appellant knew the ladder had not been inspected as required by its own regulations and that there was some evidence that the fall proximately caused the injury. The trial judge also mentioned the fact that appellees prevailed at the arbitration and appellant failed to settle the prejudgment interest claim or pay the judgment as of the date the motion was ruled on, but those are not legitimate factors to consider. As *Kalain* stated, the issue is pre-trial behavior, not post-trial. In addition, losing the arbitration is irrelevant. Many parties lose at arbitration and then prevail at trial. Parties should not be forced to settle just because they lost at arbitration.

The trial court did not rely on any alleged attempt to delay or failure to cooperate in discovery.

A rational evaluation of the case could only result in the conclusion that appellant had not inspected and that appellees had evidence that the injury was the proximate result of the fall caused by the break in the cable. Although appellees' doctor might be discredited, he might still be believed. Appellant could not assume he would not be. Appellant was counting on Mr. Marous being barred a recovery due to comparative negligence. However, even if Mr. Marous did lean back with a jerk, as his expert's report said he told the expert, the fall could have been prevented if the cable had been inspected.

The decision of the trial court cannot be reversed unless the order granting prejudgment interest was an abuse of discretion. As the parties note the Ohio Supreme Court has defined an abuse of discretion as follows:

" '[A]n abuse of discretion involves far more than a difference in * * * opinion * * *. The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing consider-

ations. In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. * * *.' " *State v. Jenkins* (1984), 15 Ohio St.3d 164, 222, 15 OBR 311, 361, 473 N.E.2d 264, 313 quoting *Spalding v. Spalding* (1959), 355 Mich. 382, 384–385, 94 N.W.2d 810, 811–812. We cannot say that the decision to grant prejudgment interest was an abuse of discretion.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

JOHN F. CORRIGAN and ANN MCMANAMON, JJ., concur..