AVONDET, f.k.a. Gambitta, Appellee and Cross–Appellant,

v.

BLANKSTEIN, Appellant and Cross–Appellee.

[Cite as *Avondet v. Blankstein* (1997), 118 Ohio App.3d 357.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 69934, 69935.

Decided Feb. 24, 1997.

*Zipkin, Fink & Whiting, Mary E.R. Bartholic* and *Deborah L. McNinch,* for appellee and cross-appellant.

*Jacobson, Maynard, Tuschman & Kalur, John A. Simon, Stephen S. Crandall,* and *Susan M. Reinker,* for appellant and cross-appellee.

PORTER, Judge.

Defendant-appellant and cross-appellee Josef Blankstein, M.D., appeals in case No. 69934 from the jury verdict and damage award of $30,000 in favor of plaintiff-appellee and cross-appellant Donna Avondet, f.k.a. Donna Gambitta, for medical malpractice in the failure to provide the patient with complete cautionary instructions for the contraceptive marketed under the trade name "Norplant." The cross-appellant appeals in case No. 69935 from the failure of the trial court to

award prejudgment interest. For the reasons adduced below, case No. 69934 is affirmed and case No. 69935 is overruled.

A review of the record on appeal indicates that five witnesses testified at the trial on behalf of the plaintiff. The first witness, Mrs. Susan Mulac, testified in pertinent part as follows: (1) she is a close friend and neighbor of the plaintiff; (2) in April 1992, she was shown by plaintiff a newspaper article describing the Norplant system and mentioning the name of the defendant; (3) the witness was present when the plaintiff telephoned the office of the defendant to obtain more information concerning the Norplant system; (4) the witness was aware that the plaintiff had made an appointment to meet with the defendant; (5) after the implant was done, the plaintiff, having received a pamphlet from the defendant concerning the Norplant system, told the witness that another method of birth control had to be used during the first twenty-four hours following the implant, after which time the patient was considered safe from pregnancy; (6) the plaintiff was very depressed upon learning on June 29 that she was pregnant after having the Norplant implanted in her arm by the defendant; (7) the plaintiff terminated this pregnancy by means of an abortion; (8) before having the abortion, the plaintiff received information from another doctor concerning the Norplant system, which indicated that Norplant, if implanted after the menstrual period, would not prevent a pregnancy until after the next menstrual period had occurred; (9) the witness is not aware of what the defendant told the plaintiff while at the defendant's office or what information was provided her.

The second witness for the plaintiff was Mrs. Barbara Evans, who testified as follows: (1) she has been a friend of the plaintiff since the spring of 1986; (2) an article in a newspaper concerning the Norplant system, which the witness and plaintiff read together, stated that "if Norplant is inserted at the correct time of the menstrual cycle, the woman is protected within 24 hours"; (3) the plaintiff contacted the defendant's office for more information on the Norplant system; (4) the witness accompanied the plaintiff to the visit at the defendant's office on May 29, 1992, where a nurse spoke with them concerning the Norplant system, telling them that the system was effective within twenty-four hours of implantation; (5) the witness and plaintiff were given a folder concerning the Norplant system, which stated the following: "The contraceptive effect * * * is reached within 24 hours; therefore, if the capsules are inserted during menses, you may resume sexual relations as soon as you wish"; (6) Plaintiff's Exhibit 2–A, which was printed on December 10, 1990, states the following: "Implantation of all six capsules should be performed during the first seven days of the onset of menses by the health care professional as instructed in the Norplant System insertion technique"; (7) she does not recall seeing the information identified as Plaintiff's Exhibit 5, a document titled Norplant System levonorgestrel implants, at the

doctor's office; (8) at that office visit, they next met with the defendant, who answered the same questions as the nurse; (9) the plaintiff was very upset about the fact that she was pregnant after having the Norplant implanted; (10) the plaintiff received additional information concerning Norplant from another doctor following the news of her pregnancy, which conditioned the twenty-four-hour effective time to having the implant procedure done during the menses only; (11) on cross-examination, the witness stated that she and the plaintiff did not read the information provided by the doctor in its entirety; (12) the defendant answered all questions that were put to him by the witness and the plaintiff over the two-and-one-half-hour office visit, which concluded with the implants being done at approximately 12:45 p.m. on May 29, 1992; (13) the defendant never said that the patient could have unprotected sex following the implant procedure.

The third witness for the plaintiff, as if on cross-examination, was the defendant, who stated the following: (1) he has been practicing medicine since 1970, specializing in obstetrics and gynecology; (2) when seen by the witness, the plaintiff was eleven days past the onset of her last menstrual period, which began on the nineteenth of the month, so the Norplant system, which consists of six capsules containing a total of two hundred sixteen milligrams (thirty-six milligrams per capsule) of the progestin levonorgestral, was effective only after her next menstrual period; (3) he does not know when the plaintiff conceived the aborted child; (4) given that conception is not possible for five days following the onset of menstruation, the earliest plaintiff could have conceived was May 24, 1992; (5) an ultrasound, when used to determine the date of conception, is accurate within a range of plus or minus 4.7 days; (6) plaintiff's ultrasound was performed on July 17, 1992, and indicated a conception date of May 29, 1992 (plus or minus 4.7 days); (7) he did not know if plaintiff was pregnant at the time of the May 29, 1992 office visit; (8) Plaintiff's Exhibit 2–A, an informational brochure which is provided in the Norplant system kit to the medical provider, states, "Insertion should be performed within seven days from the onset of menses; however, Norplant System capsules may be inserted at any time during the cycle, provided pregnancy has been excluded and nonhormonal contraceptive method is used for the remainder of this cycle."; (9) the plaintiff was not menstruating, i.e., bleeding, at the time of her office visit on May 29, 1992, but was using another contraceptive method (condoms) with a ten-percent failure rate; (10) based on this use of an alternative method of contraception and a physical examination, he did not suspect that the plaintiff was pregnant; (11) it is possible that the plaintiff was ovulating at the time of the May 29 office visit; (12) the plaintiff, prior to the implants, did sign a consent form prepared by the defendant which indicated that she had read the Norplant system information, that this information was explained to her, and that she understood that conception was still a possibility despite the implants.

The fourth witness for the plaintiff was Scott Avondet, the husband of the plaintiff, who corroborated the testimony of his wife, adding the following: (1) he began dating his wife in late 1991, and married her on July 7, 1993; (2) he and his wife became sexually intimate starting in March 1992; (3) he and his wife had no sexual intercourse during the week preceding the May 29 office visit.

The fifth witness for the plaintiff was the plaintiff herself, who corroborated the earlier testimony, adding the following: (1) she has never had unprotected sexual intercourse except for two six-month periods when she wanted to conceive, which resulted in the births of her two children from her first marriage; (2) her first marriage ended in 1989 upon the death of her first husband, Marty Gambitta; (3) she admits to having signed the consent form, but is not sure if some of the typed language, which states, "I understand if I am pregnant the Norplant insertion will have an adverse effect on the pregnancy," was on the form or not at the time; (4) she was never advised as to the side effects of the Norplant on a pregnancy; (5) both the doctor and his nurse told her that the system was effective after twenty-four hours following the implants; (6) she and her present husband resumed sexual relations approximately thirty-four hours following the implant procedure; (7) there was never any doubt that the witness did not want to have more than the two children she already had; (8) the abortion was performed by Dr. Rzepka on July 23, 1992 at Meridia Suburban Hospital at a cost of approximately $3,800; (9) she paid the defendant $200 so far, but the defendant has not billed the remaining $400 due on the procedure; (10) she had the Norplant removed in September 1993; (11) it was a possibility that she and her present husband had sexual intercourse within two or three days prior to the May 29 office visit; (12) when asked by the defendant during the May 29 visit whether she could be pregnant, the witness stated, "I know I'm not pregnant now"; (13) at the time of the office visit, the witness did not know what the term "menses" meant and did not ask the medical provider for a definition of that term, despite reading that term in the instructional literature for the implant system; (14) she admits to receiving and taking home the informational literature that came with the system kit, Plaintiff's Exhibit 2, but did not read it in its entirety, thereby missing the cautionary instruction concerning the need for alternative contraceptives during the remainder of the menstrual cycle if the implants are done at a point outside the menses period; (15) the defendant never told the witness that it was acceptable to have unprotected sex after twenty-four hours following the implants; (16) she first learned that she was pregnant on June 28, 1992; (17) she knew there was a possibility of pregnancy despite the presence of the Norplant system, and she was willing to accept that risk; (18) she does not recall asking any doctor about possible side effects of the Norplant on a fetus.

At this point the plaintiff rested, subject to the introduction, without objection, of Plaintiff's Exhibits 1 through 5.

The defendant then made two motions for directed verdict. The first motion was relative to the claim for punitive damages due to the failure to demonstrate malice. Subsequent to a brief period of oral argument by the parties, the trial court granted this first motion for directed verdict. The second motion for directed verdict was directed at the remaining issues of negligence due to alleged failure to demonstrate the element of causation of any injury. Defendant argued that it was just as likely that plaintiff was pregnant prior to the implantation of the Norplant, thereby rendering any failure to warn the patient of the need for alternative contraception irrelevant. Additionally, defendant argued that plaintiff failed to provide expert testimony to a reasonable degree of medical certainty that plaintiff was not already pregnant on May 29, 1992. The court denied this second motion after brief oral argument by defendant, but without benefit of oral argument by the plaintiff.

At this point, the defense offered the videotaped deposition testimony of Kathleen Dastoli, a registered nurse who worked at the defendant's office and who assisted the plaintiff in providing a medical and social history during the May 29 visit, who corroborated the testimony of the defendant, adding the following: (1) she gave the patient the two consent forms (one was prepared by the office and the other came from the manufacturer of the Norplant kit) and several items of informational literature, which indicated the warnings and precautions on the Norplant system, to the patient; (2) she was also present when the defendant performed a pelvic, thyroid and breast exam on the patient prior to the implantation of the Norplant; (3) she spoke with the patient on June 25, 1992, at which time the patient informed the office that the patient was pregnant and "didn't want this thing," in reference to terminating the pregnancy; (4) she denied telling the patient that sexual intercourse was permitted within twenty-four hours without using alternative contraceptive methods because the patient was too far along in her menstrual cycle, specifically, past the first seven days of the menstrual cycle; (5) the only time a patient can have sexual intercourse within twenty-four hours without alternative contraceptive methods is if the implants are placed within the first seven days of the menstrual cycle; (6) the defendant was very concerned with the information provided in (4) and (5) above, so he told her to use an alternative contraceptive method if she wished to have sex within twenty-four hours; (7) the defendant advised the patient of the possible adverse effect of the Norplant on a pregnancy, although she could not recall the specific effects which were mentioned.

The defense then offered the testimony of Dr. Stanley Post by way of deposition. This deposition testimony of Dr. Post, following the objection of the plaintiff, was not admitted into evidence.

The defense then rested subject to the admission of exhibits. Defendant's Exhibits A, B, C, D, F, M and O were admitted. The defense renewed its second motion for directed verdict, which again was denied. Subsequent to closing arguments by the parties the trial court issued jury instructions.

The jury returned its six-to-two general verdict finding for plaintiff in the sum of $30,000 and finding in answers to special interrogatories (1) that the defendant was negligent in not communicating the need for alternative contraceptive methods during the postmenses period, and (2) that the plaintiff did *not* become pregnant after May 29, 1992. No objection was made to the special interrogatories and no attempt was made to reconcile them with the general verdict before the jury was discharged. The court subsequently denied defendant's motion for judgment notwithstanding the verdict, which motion was premised on the absence of causation as evidenced by jury's finding that the conception occurred prior to the implantation of the Norplant. This appeal (four assignments of error) and cross-appeal (one cross-assignment of error) followed.

The first and third assignments of error will be addressed together, as they both address the issue of plaintiff's failure to prove proximate causation.

"I.    The trial court erred by failing to direct a verdict in favor of defendant-appellee Dr. Blankstein despite plaintiff's failure to establish a *prima facie* case of medical malpractice.

"III.    The trial court erred by failing to instruct the jury that a plaintiff must establish the elements of a medical malpractice case with competent medical expert testimony."

In his first assignment of error, defendant argues that the trial court erred in failing to grant his motion for directed verdict as the plaintiff failed to show that her pregnancy was proximately caused by the defendant's alleged failure to advise her of the need to have backup contraception until her next menstruation. Defendant contends in his third assignment of error that the trial court erred in failing to instruct the jury that plaintiff had to present expert testimony on the element of causation. These assignments of error have no merit.

In ruling on a directed verdict motion, Civ.R. 50(A)(4), the court construes the evidence in the light most favorable to the party opposing the motion. *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252, 255; *Mitchell v. Cleveland Elec. Illum. Co.* (1987), 30 Ohio St.3d 92, 93, 30 OBR 295, 295–296, 507 N.E.2d 352, 353–354. The judge neither weighs the evidence nor determines the witnesses' credibility. *Wagner, supra; Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178–179, 423 N.E.2d 467, 469. If the court finds that reasonable minds could come to but one

conclusion and that conclusion is adverse to the party opposing the motion, the court should direct the verdict. *Wagner* and *Mitchell, supra.*

■ To prevail in a medical malpractice action, the plaintiff must prove, by a preponderance of the evidence, not only that the defendant failed to act in accordance with the required standard of care, but that this failure was a proximate cause of the resulting injury. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraphs one and two of the syllabus. Defendant contends that since there was no expert testimony by plaintiff regarding the exact day of conception, the trial court should have granted his motion for a directed verdict. As the court in *Bailey v. Emilio C. Chu, M.D., Inc.* (1992), 80 Ohio App.3d 627, 633, 610 N.E.2d 531, 535, held:

"In addressing the issue of proximate cause, the Ohio Supreme Court has stated that a 'plaintiff in a malpractice case must prove that defendant's negligence, *in probability,* proximately caused [the injury].' (Emphasis *sic.*) *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 252, 56 O.O.2d 146, 151–152, 272 N.E.2d 97, 103–104. The court went on to define probability as 'that which is more likely than not.' (Citations omitted.) *Id.* at 253, 56 O.O.2d at 152, 272 N.E.2d at 104. Therefore, it is not enough for the plaintiff to merely prove the physician was negligent, but he or she must also prove by the preponderance of the evidence that the injury complained of was a direct result of that negligence. Additionally, it is well settled in medical malpractice cases that expert medical testimony is necessary to establish this casual connection between the negligence and injury, whenever this relationship is beyond the common knowledge and understanding of the jury. *Darnell v. Eastman* (1970), 23 Ohio St.2d 13, 17, 52 O.O.2d 76, 78, 261 N.E.2d 114, 116–117; *Cooper, supra,* 27 Ohio St.2d at 253, 56 O.O.2d at 152, 272 N.E.2d at 104."

In the case herein, the negligence was defendant's alleged failure to communicate to the patient the need for alternative contraceptive methods until the next menstrual cycle, and the injury was the resulting unwanted pregnancy.

■ The defendant doctor testified that based on the ultrasound results, which were admitted into evidence, the plaintiff could have conceived any time from May 24 to June 3, 1992. He inserted the implants on May 29. Therefore, the plaintiff could have conceived either five days before or four days after the implant date. This in itself would not be enough to conclude that it was more likely than not that she conceived after the implants. However, the defendant also testified that plaintiff was using condoms before the implants. According to defendant, condoms are ninety-percent effective in preventing pregnancies. (This means there was only a ten-percent chance that she was pregnant before Norplant). This expert evidence along with plaintiff's testimony that she did,

indeed use condoms before the implants and that she never had unprotected intercourse, presents sufficient evidence to support the conclusion that it was "more likely than not" that she conceived after the implants were inserted. Since reasonable minds could differ on the proximate causation issue, the trial court correctly overruled the defendant's directed verdict motion.

■ Regarding the expert evidence, defendant himself, a specialist in the area of gynecology/obstetrics, provided sufficient evidence regarding the conception possibilities based on the ultrasound report and plaintiff's method of birth control before the Norplant inserts. Plaintiff also provided testimony regarding her contraception habits, which aided the jury in determining the probabilities of when conception occurred. As stated above, expert testimony is not always needed when it is within the understanding of a layperson. Therefore, the trial court correctly refused to instruct the jury on this point.

Assignments of Error I and III are overruled.

"II. The trial court erred by precluding defendant Dr. Blankstein from reading the deposition of plaintiff's expert, Dr. Stanley Post, into evidence at trial."

■ In his second assignment of error defendant argues that the trial court erred in not allowing the defense to read the deposition testimony of plaintiff's expert, Dr. Post, into the record. This assignment of error has no merit.

Dr. Post's testimony was basically the same testimony given by the defendant. Defendant acknowledged that if he had not advised plaintiff about backup contraception, his conduct would have fallen below the standard of care owed to plaintiff. He also stated that the plaintiff could have conceived either before or after the implants. Therefore, Dr. Post's testimony did not add anything of significance to the evidence. As this court in *Shimola v. Cleveland* (1992), 89 Ohio App.3d 505, 511, 625 N.E.2d 626, 629–630, held:

"The trial court has broad discretion in the admission and exclusion of evidence under Evid.R. 403, exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. A reviewing court should be slow to interfere unless the court has clearly abused its discretion and a party has been materially prejudiced thereby."

In the case herein, since Post's testimony was redundant the court did not abuse its discretion in not allowing the testimony and the defendant was not prejudiced thereby.

Assignment of Error II is overruled.

"IV. The trial court erred to the prejudice of defendant-appellant when it failed to correctly respond to a jury question posed during its deliberations."

In his last assignment of error defendant argues that the trial court answered a question by the jury incorrectly, which evidently led to the jury's inconsistent answers to the interrogatories. This assignment of error has no merit.

During deliberations the jury asked the trial court the following question: "Does the law state that the doctor has only a responsibility to inform a patient? or Does the doctor have a responsibility to do whatever he [can] to make certain the patient understands what he informs his patient?" The trial court answered the question on the record as follows:

"Let me tell you that a physician does have a duty to inform the patient by presenting her with sufficient information and instruction to prevent harm to the patient. The measure or the extent of that instruction, of course, is simply what is reasonable under all of the circumstances. The duty to inform is based upon the harm which is reasonably foreseeable from a failure to so inform the patient.

"And the real issue, I mean the basic underlying issue that's been presented in this case is whether the physician did inform the patient, the plaintiff. The plaintiff claims he did not inform her sufficiently. The physician says he did. It becomes a question of credibility for the jury to determine the credibility of the witnesses here."

Defendant contends that the above instruction imposed a strict liability standard and caused the jury to answer the interrogatories as follows:

"INTERROGATORY 1:

"Do you find, by a preponderance of the evidence, that the care Dr. Josef Blankstein rendered to Donna Gambitta, as to communications made to the plaintiff, fell below the recognized standards of the medical community for obstetricians/gynecologists?

"ANSWER: Yes.

"INTERROGATORY 2:

"If you answered Interrogatory No. 1 'yes,' then state specifically in what manner Dr. Blankstein's care fell below the recognized standards of the medical community?

"ANSWER: Did not properly communicate to patient necessity for using back up contraception during intercourse after implantation of Norplant during that portion of her cycle in which it was implanted (i.e. not bleeding).

"INTERROGATORY 3:

"If you find Dr. Blankstein's care fell below the recognized standards of the medical community, do you also find that plaintiff Donna Gambitta became pregnant after May 29, 1992?

"ANSWER: No."

■ A reading of the court's answer to the jury's question does not indicate that the court imposed a strict liability standard on the defendant. The court instructed that the extent of the doctor's duty to inform the patient was dependent on what "is reasonable under all of the circumstances" and "based upon the harm which is reasonably foreseeable" if the patient is not informed. Since the court instructed the jury that the duty is based on reasonable foreseeability of harm, it was not a strict liability standard.

■■ Even if it were erroneous, it was not misleading to the jury when reading the court's instructions in their entirety. *Kokitka v. Ford Motor Co.* (1995), 73 Ohio St.3d 89, 93, 652 N.E.2d 671, 674–675. "Where the court's charge to the jury, considered as a whole, is not prejudicial to the objecting party, no reversible error results from a misstatement or ambiguity in a portion thereof." *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 44 O.O.2d 18, 238 N.E.2d 563, paragraph three of the syllabus. In the case herein, the trial court had clearly instructed the jury on the elements of negligence and properly instructed them that if the doctor's negligence did not cause plaintiff's injury, then the plaintiff could not recover damages:

"[I]f you conclude that the plaintiff, Donna Avondet, was already pregnant at the time of Dr. Blankstein's placement of the Norplant, she cannot recover damages for any consequences as a result of that condition that are not damages proximately caused by the negligence on the part of Dr. Blankstein."

■ Although we recognize that there is clearly an inconsistency between the general verdict and the jury's interrogatory answers, defendant waived any error in the inconsistency by failing to object before the jury was discharged. An objection to an inconsistent answer by a jury to an interrogatory is waived unless the party raises the objection prior to the jury's discharge. *Cooper v. Metal Sales Mfg. Corp.* (1995), 104 Ohio App.3d 34, 42, 660 N.E.2d 1245, 1250–1251; *Greynolds v. Kurman* (1993), 91 Ohio App.3d 389, 395, 632 N.E.2d 946, 950; *Midwest Specialties, Inc. v. Firestone Co.* (1988), 42 Ohio App.3d 6, 11, 536 N.E.2d 411, 416–417; *Haehnlein v. Henry* (1987), 41 Ohio App.3d 233, 234, 535 N.E.2d 343, 344–345; *Santill v. Gen. Elec. Co.* (Apr. 4, 1991), Cuyahoga App. No. 58377, unreported, at 18, 1991 WL 45559. The policy reasons behind requiring an objection are "(1) to promote the efficiency of trials by permitting the reconciliation of inconsistencies without the need for a new presentation of evidence to a different trier of fact, and (2) to prevent jury shopping by litigants who might wait to object to an inconsistency until after the original jury is discharged." *Greynolds*, 91 Ohio App.3d at 395, 632 N.E.2d at 950.

A review of the transcript shows that the trial court gave counsel the opportunity to object after reading the special interrogatories and general verdict. The following conversation appears on the record:

"COURT: Anything further counsel?

"REINKER: I would want to speak to the court on the record I think privately, your Honor. I don't think there is any need to—may we see the interrogatory answers?

"COURT: Counsel may see it all. Any need to keep the jury any longer?

"REINKER: If we can hold on one second, your Honor. We feel no need for the jury any further, Your Honor."

Thereafter, a discussion was had off the record and the jury was then excused. Moments after the jury was excused, the record reveals, defense counsel first voiced her objection to the inconsistency between the interrogatories and general verdict.

This is clearly a case of waiver, as counsel consciously waited for the jury to be excused before she made any objection, thereby preventing the court from correcting the inconsistency under Civ.R. 49(B). "Any other decision would encourage jury shopping by litigants, who might preclude resubmission of the verdict merely by waiting to object until after the original jury is discharged." *Midwest Specialties,* 42 Ohio App.3d at 11, 536 N.E.2d at 416; *Haehnlein v. Henry,* 41 Ohio App.3d at 234, 535 N.E.2d at 345.

We distinguish the instant case from *O'Connell v. Chesapeake & Ohio R.R. Co.* (1991), 58 Ohio St.3d 226, 569 N.E.2d 889, where the inconsistencies between the general verdict and the interrogatories were not apparent until the jury was discharged. In *O'Connell,* the inconsistencies were created by inconsistencies in the participation of the jurors in answering the interrogatories. For instance, one of the jurors did not respond to the proximate cause interrogatory, yet participated in apportioning the fault between the two parties, and another juror did not respond to the interrogatory regarding whether one of the parties was negligent, but then in the interrogatory apportioning the percentage of fault, found the party thirty-percent negligent. In the case herein, the inconsistency between the interrogatories and the verdict was apparent on its face and does not justify a plain-error exception.

Assignment of Error V is overruled.

CROSS–APPEAL

"I. The trial court erred by failing to award plaintiff-appellee/cross-appellant, Donna Avondet, prejudgment interest pursuant to Section 1343.03(C) of the Ohio Revised Code."

In her cross-assignment of error, plaintiff argues that the trial court erred in not awarding her prejudgment interest as defendant refused to settle the case. This assignment of error has no merit.

R.C. 1343.03(C) states as follows:

"Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date of the cause of action accrued to the date on which the money is paid, *if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.*" (Emphasis added.)

This court in *Marous v. Ohio Bell Tel. Co.* (1992), 80 Ohio App.3d 306, 309, 609 N.E.2d 192, 193–194, held:

" 'The decision as to whether a party's settlement efforts indicate good faith is generally within the sound discretion of the trial court * * * [and] [t]his court will not overturn a finding on this issue unless the court's actions indicate an abuse of discretion.' *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 203, 495 N.E.2d 572, 574. An abuse of discretion connotes more than an error of law or judgment; it implies an unreasonable, arbitrary or unconscionable attitude.

" 'A party has not "failed to make a good faith effort to settle" under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary offer.' *Kalain, supra,* at syllabus (holding award of prejudgment interest an abuse of discretion)." (Citation omitted.)

Given the difficulty in proving proximate causation in this case, it was reasonable for the defendant to think that there existed no liability on his part. As this court in *Hardiman v. Zep Mfg. Co.* (1984), 14 Ohio App.3d 222, 227–228, 14 OBR 250, 255–257, 470 N.E.2d 941, 947, held:

"Additionally, R.C. 1343.03(C) does not penalize those who choose to go to trial; it only affects those who choose to go to trial and then abuse the trial process, those who fail to conduct a lawsuit in good faith.

"It would be unconstitutional to penalize a party for exercising his right to a trial."

The trial court did not abuse its discretion and its denial of prejudgment interest is affirmed.

Plaintiff's cross-assignment of error is overruled.

The judgment is affirmed in case No. 69934; the cross-appeal is overruled in case No. 69935.

*Judgment affirmed.*

James D. Sweeney, P.J., and Patricia Ann Blackmon, J., concur.