**Susan WINKLE, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. C–3–96–279.**

United States District Court, S.D. Ohio, Western Division.

Aug. 14, 2001.

---

John David Holschuh, Jr., Santen & Hughes, Cincinnati, OH, Richard Todd Brown, Fairborn, OH, for Plaintiffs.

Patrick Dennis Quinn, United States Attorney's Office, Dayton, OH, for Defendant.

DECISION AND ENTRY SETTING FORTH REASONING IN SUPPORT OF COURT'S DETERMINATION THAT PLAINTIFFS HAVE FAILED TO ESTABLISH MEDICAL MALPRACTICE; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFFS; TERMINATION ENTRY.

RICE, Chief Judge.

This litigation stems from alleged medical malpractice committed by Dr. Brian Riedel, a pediatric gastroenterologist at Wright–Patterson Air Force Base (Wright–Patt) in Dayton, Ohio. The Plaintiffs are Susan and Eugene Winkle and their daughter, Lauran, who is a military dependent. In a second amended Complaint, they allege that Dr. Riedel misdiagnosed Lauran as suffering from lymphoid hyperplasia and negligently treated her with a steroid known as prednisone.[1] (Doc. # 27 at ¶ 8). Doctors in Germany continued to treat Lauran with prednisone but later changed her diagnosis and took her off of the drug. Allegedly as a result of her treatment with prednisone, however, Lauran has developed a disorder called Cushing Syndrome, and she has sustained severe and permanent injuries. After filing an administrative claim for relief, the Plaintiffs commenced this litigation against the United States, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*

In a January 27, 1997, Entry, the Court ordered trifurcation of proceedings in this case. (Doc. # 16). In Phase I, the Court addressed the Defendant's potential liability for actions taken by military doctors in Germany. (*See* Decision and Entry, Doc. # 28). In particular, the Court concluded that *if* Dr. Riedel's diagnosis and prescription of prednisone constituted medical malpractice, and *if* the doctors in Germany relied on Dr. Riedel's diagnosis and course of treatment in making their own diagnoses and formulating their own treatment plans, "then the initial diagnosis was *a* proximate cause of *all* the injuries caused by the prednisone ingestion, regardless of where that ingestion took place."[2] (*Id.* at 16). As a result, the Court held that the Defendant conceivably could be held liable for the actions taken by the military doctors stationed in Germany.

1. Although Dr. Riedel is not identified by name in the second amended Complaint, it is undisputed that he is the doctor who initially diagnosed Lauran and prescribed prednisone.

2. The Court recognized that, under the Federal Tort Claims Act, the Defendant could not be held liable for the medical malpractice of military doctors stationed in Germany. *See* 28 U.S.C. § 2680(k) (providing that the United States' waiver of immunity does not apply to "[a]ny claim arising in a foreign country"). The Court reasoned, however, that if the military doctors in Germany relied, even negligently, on Dr. Riedel's diagnoses and treatment, then the Defendant "can be held liable for injuries from the entire course of prednisone treatment, regardless of where it occurred, since Dr. Riedel's diagnosis and treatment plan would be a proximate cause of all of Lauran's injuries." (Doc. # 28 at 16 n. 4). On the other hand, "if the doctors in Germany did not so rely and they made their own, independent diagnosis and mis-prescription, then: 1) the government cannot be liable for those independent superseding acts and their sequelae, even if those acts constituted medical malpractice, and 2) Dr. Riedel's negligence (if any) and the consequences thereof will be cut off as of the time of this superseding cause." *Id.*

This litigation is now at Phase II, which involves the Court determining whether the Plaintiffs have established medical malpractice on the part of Dr. Riedel.[3] In particular, as set forth more fully, *infra,* the Court's analysis in Phase II will focus on the "standard of care" and "breach" elements of medical malpractice. In accordance with the Court's prior rulings, these issues have been submitted on written briefs (and a stipulated medical record), without the need for an evidentiary hearing. (*See* Doc. # 16 at 1–2; Doc. # 28 at 2). As noted previously by the Court, if this action remains viable after its ruling on the issue of medical malpractice (i.e., the "standard of care" and "breach" elements), Phase III will involve an evidentiary hearing in open court on the elements of proximate cause and damages. (Doc. # 28 at 2).

## I.  *Factual Background*[4]

Lauran Winkle was born into an Air Force family. In 1991, her family was stationed at Wright–Patt. In May, 1991, Lauran, then age 12, began having episodes of diarrhea and vomiting. She was seen by physicians at Wright–Patt's Pediatric and Adolescent Clinic and was diagnosed with gastroenteritis. She returned later with the additional complaints of a stomach ache and burning urination, and still later with complaints of abdominal pain. She eliminated tomato products from her diet and was asymptomatic for the rest of the summer.

In early September, 1991, her symptoms returned, as she began to have a stomach ache, sore throat and diarrhea. She was seen by Dr. Riedel on September 16, 1991. Dr. Riedel ordered several tests, including an Upper GI of the bowel performed on October 1, and an air contrast barium enema performed on November 12, 1991. The results of these tests did not point to any particular cause of Lauran's problems. Dr. Riedel then performed a colonoscopy with biopsy on November 22, 1991. The purpose of this test, his notes reveal, was to "evaluate for lymphoid hyperplasia versus inflammatory bowel disease." After the test, he concluded that Lauran was suffering from "lymphoid hyperplasia of the colon and terminal ileum."

---

**3.** It is evident from the Court's Phase I ruling that if Dr. Riedel *did not* commit medical malpractice, then the United States cannot possibly be held liable under the Federal Tort Claims Act for any of the actions taken by the military doctors in Germany. As the Court previously explained, the only possible way for the Defendant to be held liable for actions taken by the doctors in Germany is if those actions were proximately caused by malpractice on the part of Dr. Riedel. Therefore, if Dr. Riedel did not commit malpractice, this his (non-existent) negligence could not have been a proximate cause of any injury that Lauran sustained in Germany as a result of her being prescribed prednisone in that country. Consequently, for purposes of Phase II, the critical issue is whether Dr. Riedel committed malpractice (i.e., breached the applicable standard of care) in his diagnosis and course of treatment at Wright–Patt. If not, then the Defendant is entitled to judgment in its favor. If so, then this action will proceed to Phase III for a determination of causation and damages.

**4.** The background facts of this case are fully set forth in the Court's March 26, 1998, Decision and Entry resolving Phase I. (Doc. # 28 at 4–9). Those facts were derived largely from the parties' Stipulated Submission of Chronological Summary of Medical Records and Medical Records from Wright–Patterson Air Force Base. (Doc. # 20). The Stipulated Summary is denoted as Exhibit A, and the medical records themselves are labeled as Exhibit B. The background facts contained in the Court's Phase I ruling will be repeated herein for convenience. In its analysis, *infra,* the Court will supplement those background facts when discussing the evidentiary materials attached to the parties' respective Phase II Memoranda (Doc. # 30, 36, 37).

On November 22, 1991, Dr. Riedel decided to place Lauran on a course of prednisone to control her symptoms. (Outpatient Rec. at 113A). He planned to start her the following day on a prescription of two, 10 mg. tablets per day. In two weeks, he planned to drop her level of ingestion, alternating between one and two tablets per day. (*Id.* at 111A, 110).

Dr. Riedel's notes from December 13, 1991, indicate that Lauran was feeling much better and that her abdominal symptoms had disappeared. (*Id.* at 109). Accordingly, he lowered her prednisone dosage to 20 mgs. every other day. (*Id.*). Three days later, Dr. Riedel noted that Lauran's diagnosed illness, nodular lymphoid hyperplasia, was "resolving on prednisone therapy." (*Id.* at 108). Dr. Riedel planned a further reduction of the dosage to 10 mgs., then to 5 mgs., and finally to 2.5 mgs.

On January 10, 1992, Dr. Riedel noted that Lauran's abdominal pain was again occurring. Based on the timing of the recurrence (after the drop from 5 mgs. to 2.5 mgs.), he resumed Lauran at the 5 mg. level and decided to reduce the dosage more slowly. (*Id.* at 106–107). Toward the end of January, Dr. Riedel noted that Lauran was still on a 5 mg. per day prescription, but she was apparently taking 10 mgs. per day, contrary to his orders. (*Id.* at 105). He returned her to the 5 mg. level, indicating that she should be dropped to 2.5 mgs. on February 18, 1992. (*Id.*). The medical records reveal that Lauran continued on prednisone through February. Dr. Riedel noted on February 18, 1992, that he was "decreas[ing] prednisone today." (Outpatient Rec. at 103). As of March 24, 1992, she reported taking no medication. (*Id.* at 102). Dr. Riedel last saw Lauran on May 19, 1992, and was advised that she was suffering from cramps and loose stools. The notes from the visit indicate that Dr. Riedel wished to observe the situation for five days and, if it persisted, to "consider a brief period of prednisone retreatment for persistent [illegible]." (*Id.* at 100). The record does not reveal any further prednisone treatment by Dr. Riedel.

Lauran's father subsequently transferred to Bitburg Air Force Base in Germany. She resumed medical treatment at the Pediatric Clinic at Bitburg, seeing Dr. Melanie Olson on September 29, 1992. Dr. Olson's notes incorrectly reflect that Lauran had been taking prednisone for six months, until the discontinuation of treatment in February, 1992. (*Id.* at 98). She diagnosed Lauran with a urinary tract infection and prescribed a course of prednisone. Specifically, her notes suggest that Lauran was to take 20 mgs. per day for two days, then 15 mgs. for one day, then 10 and 5 mgs. (*Id.*).

On November 20, 1992, Dr. James Larrison, of the Family Practice Clinic at Bitburg, referred Lauran to Pediatrics. He noted on the referral form that Lauran had been diagnosed with lymphoid hyperplasia from April, 1991, to January, 1992, and that she had been treated with prednisone. His provisional diagnosis was "? recurrence of nodular lymphoid hyperplasia." (*Id.* at 91). On November 23, 1992, Dr. Jean Comeau met with Lauran and reviewed her history. In his assessment, he stated "RIO inflammatory bowel disease—RIO NLH." (*Id.*). These notes are uninterpreted. In any event, he arranged for a gastroenterology evaluation. On December 2, 1992, Lauran underwent a Lower GI, and on December 7, 1992, she underwent an Upper GI. (*Id.* at 318–19). On the report accompanying the results of the Lower GI, Wolfgang Werner, Chief of Radiology Services, stated that "there is no evidence of lymphoid hyperplasia." (*Id.* at 319).

On February 3, 1993, Lauran was admitted to the emergency services at Bitburg for an unintentional overdose of prednisone. Lauran had pills left over from the bottle prescribed by Dr. Riedel at Wright–Patt. Due to continued abdominal pain and depression, Lauran had resumed a course of prednisone. The records reveal she took twenty-two pills over eight days. She had resumed taking the prednisone pills on her own, without the sanction of any medical professionals.

On March 1, 1993, Lauran was evaluated at the medical center at Landstuhl in Germany. A colonoscopy with biopsy was performed, and Lauran was diagnosed with "focal nodular hyperplasia." She was placed on Bentyl. (*Id.* at 12, 13, 86A). After complaining of sinus congestion, coughing and sneezing, Lauran was again seen by Dr. Olson at Bitburg on April 5, 1993. (*Id.* at 85). Dr. Olson noted in her history that Lauran had been on prednisone. Dr. Olson's plan does not indicate that she would prescribe prednisone for the sinus problem. (*Id.*). Nevertheless, two days later, Lauran was seen for "a weight problem," and the report indicates that she had restarted taking the prednisone a week before. She continued on the prednisone, at varying levels, through the end of April, 1993. (*Id.* at 82–84).

On October 29, 1993, Lauran was complaining of diarrhea and abdominal pain, and she was seen by Dr. James White. His notes indicate that Lauran had a long history of inflammatory bowel disease (i.e., Crohn's disease), and that she had been treated with prednisone. (*Id.* at 79–80). The notes also indicate that an examination the year before at Landstuhl had confirmed a lymphoid hyperplasia. Dr. White concluded that Lauran's current problems were caused by Crohn's disease, and he started her on a heavy dosage of prednisone, requiring larger daily doses than had

been prescribed before, for a nine-day period. Dr. White saw Lauran again on November 15, 1993, when she again complained of diarrhea and stomach cramps. He renewed his plan for a heavy dosage of prednisone. (*Id.* at 78). Lauran was hospitalized the next day. She had blood in her stool, stomach pains and diarrhea. (*Id.* at 77). She again was diagnosed with Crohn's disease, and she was referred to Gastroenterology.

Lauran then was tested by Dr. William Andolsek. The tests from this referral conclude: "Thickened linear folds in the area of the terminal ileum of uncertain significance. This may be a normal variation. There is no definite evidence of Crohn's disease." (*Id.* at 76). Dr. Andolsek's suspicions were confirmed by Dr. Zdanek Bocek, who examined Lauran on November 29, 1993. Dr. Bocek's impression of Lauran's symptoms led him to conclude that her affliction was Irritable Bowel Syndrome, and not Crohn's disease. He took Lauran off of prednisone and referred her to an allergist. Dr. Gregory Wickern, the allergist, also assessed Irritable Bowel Syndrome as a possibility. (*Id.* at 72).

In February, 1994, Lauran was air-lifted from Germany to Salt Lake City, Utah, for treatment of Major Depressive Disorder. Tests indicated that some of her problems were the result of her prednisone treatment. (*Id.* at 69–69C). She was seen by Dr. John Stanchfield in early 1994. Dr. Stanchfield concluded that Lauran suffered from obesity, fatigue and depression, and that these symptoms were associated with Cushing's syndrome. (*Id.* at 196–96). Another doctor, Colin Van Orman, also saw Lauran in early 1994. He noted problems with "black outs," depression and an abnormal cranial CT scan. Many of her problems, he noted, came after the prescription of prednisone. (*Id.* at 194–96). Since that time, Lauran has continued to

suffer from a number of health maladies. The source of these problems has been traced to her treatment with prednisone.

## II. *Analysis*

■ In order to prevail on a claim of medical malpractice, a plaintiff must establish three essential elements: (1) the applicable standard of care; (2) a breach of that standard of care (i.e., a negligent failure of a physician to render treatment in conformity with the applicable standard of care); and (3) a showing that the physician's breach of the standard of care proximately caused the plaintiff's injury. *Starkey v. St. Rita's Medical Center*, 117 Ohio App.3d 164, 690 N.E.2d 57, 60 (1997); *see also Avondet v. Blankstein*, 118 Ohio App.3d 357, 692 N.E.2d 1063, 1068 (1997).[5]

■ In order to establish the applicable standard of care in a medical malpractice case, a plaintiff is required to present expert testimony. *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673, 677 (1976); *see also Fox v. Franciscan Medical Center*, 2001 WL 62501 (2nd Dist. Jan. 26, 2001) (unpublished) (requiring expert testimony in a medical malpractice case to establish the applicable standard of care). In determining whether the applicable standard of care has been breached, the test is whether the physician "in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances." *Bruni,*

346 N.E.2d at 676. A plaintiff in a medical malpractice action ordinarily must provide expert testimony to establish a breach of the applicable standard of care. *Id.* at 676–677. An exception exists, however, "where the nature of the case is such that the lack of skill or care of the physician ... is so apparent as to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it, and in such case expert testimony is not necessary." *Id.* at 677.

In the present case, the Plaintiffs assert that Dr. Riedel breached the applicable standard of care that he owed to Lauran Winkle in two ways. *First,* they contend that he breached the standard of care by prescribing prednisone after diagnosing her with lymphoid hyperplasia. According to the Plaintiffs, prednisone is not a proper treatment for lymphoid hyperplasia. (Doc. # 30 at 7–10). *Second,* the Plaintiffs contend that Dr. Riedel breached the applicable standard of care by failing to inform them or Lauran's other doctors in the United States and Germany of his "rationale and expectations" for prednisone. (*Id.* at 10–17). More specifically, the Plaintiffs argue that Dr. Riedel breached the applicable standard of care by failing to explain that he was prescribing prednisone for a short period of time and that Lauran was not to continue with extended steroid therapy. (*Id.*).

■ With respect to Dr. Riedel's second alleged breach, his failure to communicate his "rationale and expectations" for prednisone, the Court notes the absence of expert testimony identifying the standard of care that he owed to Lauran. In their Memorandum, the Plaintiffs insist that Dr.

---

**5.** The Federal Tort Claims Act provides that the Defendant's liability is to be determined "in accordance with the law of the place where the act or omission occurred." 28

U.S.C. § 1346(b). Given that Dr. Riedel's "act or omission" took place at Wright–Patt, the Court previously recognized that Ohio tort law applies. (*See* Doc. # 28 at 10).

Riedel's "failure to properly communicate his rationale and expectations for prednisone use to either the Winkles or to Lauran's other medical providers" was "clear malpractice." (Doc. # 30 at 10–11). In support of this proposition, they cite nothing. The only expert testimony provided by the Plaintiffs comes from Dr. James E. Heubi. In an affidavit, Heubi opines that Dr. Riedel's use of prednisone to treat lymphoid hyperplasia fell below the applicable standard of care. (*Id.* at Exh. D). Notably, Dr. Heubi's affidavit completely fails to address whether Dr. Riedel's communication and documentation efforts fell below the applicable standard of care. (*Id.*). As the Ohio Supreme Court has recognized, however, "[p]roof of the recognized standards must necessarily be provided through expert testimony[,]" and the "[f]ailure to establish the recognized standards of the medical community has been fatal to the presentation of a prima facie case of malpractice...." *Bruni,* 346 N.E.2d at 677.

Absent expert testimony on the issue, the Court simply has no basis for concluding that Dr. Riedel's communication with the Plaintiffs and Lauran's other doctors, and his medical documentation regarding her condition, were so deficient that they fell below the standard of care that he owed to Lauran. In their Memorandum, the Plaintiffs insist that Dr. Riedel should have anticipated that Lauran would visit other medical providers, that she would explain her symptoms and past prednisone use, and that she would receive additional prednisone prescriptions based on his prior treatments with the drug. (Doc. # 30 at 11). According to the Plaintiffs, Dr. Riedel was obligated to do more than inform them that Lauran had a bowel disease and that he was prescribing prednisone. (*Id.* at 12). In particular, they argue that he was required to inform them, and to document for other medical provid-

ers, that Lauran was not to take prednisone for an extended period of time and that she did not have Crohn's disease. (*Id.* at 14, 17).

Upon review, the Court notes the Plaintiffs' failure to identify the standard of care applicable to Dr. Riedel's communication and documentation efforts. As a result, it is difficult, if not impossible, to conclude that his conduct breached that standard of care. The Plaintiffs concede that Dr. Riedel informed them that Lauran had a bowel disease and that he was prescribing prednisone. (Doc. # 30 at 12). Furthermore, the evidence reveals that Dr. Riedel documented his diagnosis of lymphoid hyperplasia and his course of treatment with prednisone. In particular, the record reflects that Dr. Riedel performed a colonoscopy with a biopsy on November 22, 1991, in order to determine whether Lauran was suffering from lymphoid hyperplasia or Crohn's disease. (Outpatient Rec. at 111, 111B). Following the procedure, he documented Lauran's diagnosis as "Prob. lymphoid hyperplasia." (*Id.*). He also documented his decision to place her on a "short course [of] prednisone for symptom control." (*Id.* at 113A). Thereafter, he documented her improvement and noted his belief that her lymphoid hyperplasia was "resolving on prednisone therapy." (*Id.* at 108). Dr. Riedel then adjusted Lauran's dosage of prednisone several times in an attempt to taper her off of the drug. The doctor's notes from February 18, 1992, indicate his belief that her lymphoid hyperplasia had "resolved." (*Id.* at 103). Lauran returned to Dr. Riedel on May 19, 1992, however, complaining of cramps and loose stools. The doctor's notes from that day reflect that he was considering a "brief period of prednisone retreatment for persistent [illegible]." (*Id.* at 100). The record does not reveal any further prednisone treatment by Dr.

Riedel. Absent expert medical testimony on the issue,[6] the Court simply has no basis to conclude that the foregoing level of communication and documentation by Dr. Riedel violated the standard of care that he owed to Lauran.[7]

■ With respect to Dr. Riedel's other alleged breach of the applicable standard of care, namely his decision to prescribe prednisone after diagnosing Lauran with lymphoid hyperplasia,[8] the Plaintiffs have provided the Court with expert testimony. As noted, *supra*, they rely upon an affidavit from Dr. Heubi, who avers, in relevant part:

25. At no time during the course of Lauran Winkle's illness was treatment with prednisone justified either on a trial basis or for long term management of her gastrointestinal symptoms.

26. The standard of care for this child was breached initially by prescribing prednisone for the treatment of nodular lymphoid hyperplasia.

27. As a practicing pediatric gastroenterologist, treatment of nodular lymphoid hyperplasia with prednisone is not the standard of care.

28. There has been no controlled study which has produced findings that would suggest that prednisone would be beneficial for the treatment of nodular lymphoid hyperplasia.

29. In addition, no authoritative text recommends the use of prednisone for the treatment of this condition. . . .

31. It is my opinion that the initial use of prednisone by Dr. Riedel at Wright–Patterson Air Force Base was below the standard of care for a practicing pediatric gastroenterologist. . . .

(Doc. # 30 at Exh. D).

In opposition to the foregoing assertions, the Defendant has provided the

---

6. Even if expert testimony were not always necessary to establish the applicable standard of care in a medical malpractice case, the Court would find it necessary in this case. It is not immediately apparent or obvious to the Court that Dr. Riedel's communication and documentation efforts were so deficient that they violated the duty that he owed to Lauran.

7. Indeed, absent expert testimony to the contrary, it occurs to the Court that Lauran's other doctors should have been capable of reviewing Dr. Riedel's notes and determining for themselves whether it was appropriate to reinstate prednisone treatments. In other words, the Court has no basis to find that Dr. Riedel was obligated to inform other doctors that she should not take prednisone for an extended period of time. If the extended use of a steroid such as prednisone would place Lauran's health at risk, it occurs to the Court that her other medical providers should have been aware of that fact without being so informed by Dr. Riedel.

8. In their second amended Complaint, the Plaintiffs suggest that Dr. Riedel committed malpractice both by misdiagnosing Lauran with lymphoid hyperplasia and by treating her with prednisone. (Doc. # 27 at ¶ 8, 11).

In their Memorandum, however, the Plaintiffs do not focus on Dr. Riedel's alleged misdiagnosis. Rather, they argue that prednisone is not a proper treatment for lymphoid hyperplasia, even if Dr. Riedel's initial diagnosis was justified. (Doc. # 30 at 7–10). In any event, to the extent that the Plaintiffs might allege malpractice on the basis of a misdiagnosis by Dr. Riedel, they have not established such a claim by the preponderance of the evidence. In fact, nothing in the record indicates that Dr. Riedel's diagnosis of lymphoid hyperplasia was incorrect or unjustified by the results of Lauran's medical tests. The Plaintiffs' own expert, Dr. Heubi, has acknowledged that the biopsies taken at the time of Dr. Riedel's colonoscopy "were consistent with lymphoid hyperplasia." (Doc. # 30 at Exh. D, ¶ 8). As Dr. Heubi notes, Lauran subsequently was misdiagnosed with Crohn's disease by another doctor, who incorrectly believed that she had a long history of suffering from the disease. (*Id.* at ¶ 21, 22, 30). For present purposes, then, the only issue is whether Dr. Riedel breached the applicable standard of care by treating lymphoid hyperplasia with prednisone.

Court with an affidavit from its own medical expert, Dr. Fayez K. Ghishan, who avers, in relevant part:

14. By November of 1991[,] Ms[.] Winkle had been experiencing over six months of somatic complaints which were interfering in her normal life functions. The records show that she was awakened from the pain at night on several occasions. She was unable to participate fully in her school activities. Earlier attempts to control or moderate the situation through dietary change had been unsuccessful and Dr. Riedel had eliminated the possibility of Crohn's disease. He placed her on prednisone for symptom control. This is something many well qualified physicians in this situation would do as a last resort. To the best of my knowledge there are no controlled studies to determine the efficacy of prednisone therapy in nodular lymphoid hyperplasia, however, physicians may resort to this therapy when symptomatic therapies fail and the patient continues to have significant symptoms. It is not something that should be done without trying to eliminate all other potential causes and treatments, but it is something that can help resolve the symptoms when nothing else works. . . .

17. In my opinion as a practicing pediatric gastroenterologist the care given Lauran Winkle by Dr. Riedel was consistent with the finest care one would be able to expect from any physician under similar circumstances.

(Doc. # 36 at Ghishan Affidavit, ¶ 14, 17).

Having reviewed the foregoing affidavits and the medical evidence in the record, the Court concludes that the Plaintiffs have failed to establish, by the preponderance of the evidence, that Dr. Riedel breached the standard of care that he owed to Lauran when he prescribed prednisone.[9] In support of their claim, the Plaintiffs note that lymphoid hyperplasia is a relatively common childhood disorder that typically resolves on its own over six to twelve months. (Doc. # 30 at 8) (citing Riedel depo. at 23). Consequently, they argue that Dr. Riedel had no reason to treat the condition with prednisone, which has been known to cause serious side effects. (Id. at 8–9). As set forth above, Dr. Heubi also avers that prednisone's effectiveness as a treatment for lymphoid hyperplasia has not been established by any controlled study. Nor has its use been recommended in any authoritative text. (Heubi Affidavit at ¶ 28–31).

On the other hand, Dr. Riedel's notes reflect that he put Lauran on a "short course [of] Prednisone for symptom control." (Outpatient Rec. at 113A). Nothing in Dr. Heubi's affidavit suggests that prednisone is ineffective in combating the symptoms caused by lymphoid hyperplasia. In addition, although it is impossible to establish a causal connection with certainty, the Court notes that Lauran's physical complaints did abate significantly when she took the drug as prescribed by Dr. Riedel. (Id. at 103, 108–109). Furthermore, the absence of a controlled study or authoritative text establishing the effectiveness of prednisone to treat lymphoid hyperplasia or to neutralize the symptoms associated with the disorder is not dispositive. Although the Defendant

9. In reaching this conclusion, the Court recognizes that it is weighing the evidence and resolving factual disputes. It is doing so, however, with the consent of the parties, who previously agreed to submit Phase I and Phase II issues on written briefs and a stipulated medical record, without the need for an evidentiary hearing. (See Doc. # 16 at 1–2; Doc. # 28 at 2).

has not identified any pertinent study or text establishing prednisone's effectiveness to treat lymphoid hyperplasia or to combat its symptoms, the Plaintiffs have not presented any study or text establishing the drug's ineffectiveness. In short, the Court is unpersuaded that the absence of a controlled study or authoritative text endorsing Dr. Riedel's chosen course of treatment is indicative of medical malpractice.

While the use of prednisone carries with it the risk of certain side effects, Dr. Riedel apparently determined, in the exercise of his medical judgment, that the risks associated with placing Lauran on a short-term, low-dose course of treatment with prednisone was outweighed by the benefit that she would receive in the form of symptom relief. According to Dr. Ghishan, this decision was a reasonable one, and it "was consistent with the finest care one would be able to expect from any physician under similar circumstances." (Ghishan Affidavit at ¶ 14, 17).

Although Dr. Heubi disagrees with Dr. Ghishan's assessment, the Court notes that paragraphs 25, 26, 27 and 31 of his affidavit are nothing more than conclusory assertions that Dr. Riedel was not justified in prescribing prednisone and, therefore, that he breached the applicable standard of care. The only explanations for this conclusion are found in paragraphs 28 and 29, which note the absence of a controlled study or authoritative text to support the use of prednisone to treat lymphoid hyperplasia, and paragraph 33, which identifies possible side effects of the drug. As noted, *supra*, however, the absence of a controlled study or authoritative text endorsing Dr. Riedel's decision is not dispositive, particularly in light of the Plaintiffs' failure to cite controlled studies or authoritative texts showing that prednisone should never be used to treat the symptoms associated with lymphoid hyperplasia.

Finally, Dr. Heubi's recognition of the potential side effects of prednisone does not persuade the Court that Dr. Riedel acted negligently in prescribing the drug. Although Dr. Riedel's decision to prescribe prednisone certainly created the risk of harmful side effects, the dosage that he prescribed was quite low and the duration of his treatment was short. The record reflects that Dr. Riedel started Lauran on a course of prednisone treatment on or about November 22, 1991, and he tapered her off of the drug in February, 1992. In finding Dr. Riedel's actions to be within the range of proper medical care, Dr. Ghishan recognizes the short term of Lauran's treatment and the relatively low dosage of prednisone prescribed by Dr. Riedel, stating:

8. The therapeutic dosing level continued for only two weeks, [and] the taper was appropriate. The dosage level was conservative in that the usual dosage would be 1 to 2 mg/Kg per day in accordance with the Pediatric Dosage Handbook (American Pharmaceutical Assoc., 1996–7). Dr. Riedel prescribed a dosage of 20 mg/day. At the time Lauran Winkle weighed 65.57 Kg. This resulted in a dosing ration of .31 mg./Kg. (Medical records 111A & 113B).

(Ghishan Affidavit at ¶ 8).

In their Reply Memorandum, the Plaintiffs cite nothing to refute Dr. Ghishan's observation that the prednisone treatment prescribed by Dr. Riedel was conservative. Instead, citing Dr. Heubi's affidavit, they insist that "[p]rednisone therapy was *never* justified to treat Lauran Winkle's [lymphoid hyperplasia].... It was not justified in any amount or for any length of time. A discussion of Lauran's weight and her dosage per kilogram is completely spurious." (Doc. # 37 at 4).

The Court cannot agree that a discussion of the duration and dosage of predni-

sone prescribed by Dr. Riedel is "completely spurious." It is axiomatic that the duration and dosage of Lauran's prednisone use had some bearing on the risk of adverse side effects. Given that the Plaintiffs cite the risk of harmful side effects as a reason not to prescribe prednisone to a child diagnosed with lymphoid hyperplasia, the duration and dosage of Dr. Riedel's treatment is highly relevant. In light of the short duration of Dr. Riedel's prednisone treatment and the exceedingly small dose of the drug that he prescribed (.31mg./Kg. per day as opposed to the usual 1 or 2 mg./Kg. per day),[10] the Court is unpersuaded by the Plaintiffs' argument that he acted negligently in using the drug to control Lauran's physical symptoms, which included persistent and severe abdominal pain and diarrhea. Accordingly, the Court holds that the Plaintiffs have failed to prove, by the preponderance of the evidence, that Dr. Riedel's prescription of prednisone fell below the applicable standard of care.

### III. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Court concludes that the Plaintiffs have failed to demonstrate that Dr. Riedel committed medical malpractice when he diagnosed Lauran Winkle with lymphoid hyperplasia and prescribed prednisone. The Plaintiffs also have failed to demonstrate that Dr. Riedel committed medical malpractice by failing to communicate with the Plaintiffs and Lauran's other medical providers and by failing to document his diagnosis and course of treatment.

Judgment will be entered in favor of the Defendant and against the Plaintiffs.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

**10.** In contrast to the conservative course of treatment prescribed by Dr. Riedel, the Court notes that the Lauran's doctors in Germany subsequently misdiagnosed her as suffering from Crohn's disease and prescribed much larger doses of prednisone. As noted, *supra,* however, given the Plaintiffs' failure to establish medical malpractice on the part of Dr. Riedel, the Defendant cannot be held liable under the Federal Tort Claims Act for malpractice committed in Germany, even if the treatment Lauran received in that country did fall below the applicable standard of care.